W. W. CARSON et al. v. LOUIS KNAFFL et al.

Western Section.    August 6, 1932.

Petition for Certiorari denied by Supreme Court, January 21, 1933.

Lindsay, Young & Atkin, of Knoxville, for appellant.

Green, Webb & Bass, of Knoxville, for appellee.

HEISKELL, J.    This is an action instituted in the Chancery Court of Knox County, Tennessee, by bill filed March 16, 1931, by W. W. Carson and wife, Eliza M. Carson, Kathelene Sheffer, A. W. Young, Virginia B. DeArmond and E. B. Powers as complainants v. Louis R. Knaffl and J. Leon Montgomery alleging the violation and contemplated violation by defendants of certain building and other restrictions in a subdivision within the limits of the City of Knoxville known as Hillvale.    By the bill it was sought to enjoin the defendants or either of them from a further violation of said restrictions. The Chancellor denied the relief sought and complainants have appealed.

The bill alleged that complainants, all residents of Knoxville, were the owners of property in a high class subdivision adjoining the Kingston Pike in Knoxville.    That in each of complainants' deeds there were certain restrictions as follows:

"The following restrictions are made a part of this conveyance and shall run with the land for a period of thirty years:

"1st.   Neither the whole or any part of these premises may be conveyed to, leased to, or occupied by, as tenants, a negro.

"2nd.   Only one residence may be built on the lot hereby conveyed as shown by the map on file.

"3rd. No building of any kind may be placed on said lot nearer than 30 feet to Hillvale Turn West, nor may any building other than a dwelling house be placed nearer than 70 feet to Hillvale Turn.

"4th.   Septic tanks or cess pools must be located as near the southwest corner of said lot as practicable, but not nearer than 10 feet to any line of same.

"5th.   No building for commercial or manufacturing purposes may be erected on these premises.

"6th.   No dwelling house must be constructed on this lot to cost less than $5,000."

That eight or ten years prior to the filing of the bill, defendant Louis Knaffl, together with one N. E. Logan and Isabell Knaffl Harlan, owners of adjacent tracts now constituting said Hillvale, conceived the plan of making said property into a high class restricted residential subdivision to be known as Hillvale.    That pursuant to this plan engineers divided said property into building lots, platting same on a map registered in the Register's Office of Knox County. That said property was extensively advertised, developed, restricted and sold as a subdivision.    That after subdividing said property,

said N. E. Logan, a real estate agent, representing himself and defendant, Louis Knaffl and Isabell Knaffl Harlan, proceeded to advertise said Hillvale extensively in newspapers in Knoxville, and by posters, signs and otherwise as a high class residential subdivision, to be sold under a uniform set of restrictions regulating the use and ownership of the lots therein. That said Hillvale was on the market under a uniform set of building restriction. That said restrictions were for the purpose of creating a high class subdivision, thus enhancing the value and desirability of the lots as home sites. That said restrictions were factors influencing complainants in their decision of purchasing their respective lots. That complainants were thus induced to and did pay enhanced prices for their lots, thus subject to the general plan of restrictions, and proceeded to build residences thereon to be used by them respectively as their homes. That in building their said residences, complainants complied specifically with said restrictions in their deeds. That complainants' residences are valuable investments. That after complainants' residences were erected, the half interest of Isabell Knaffl Harlan in and to lots 29, 30 and 35 of said Hillvale was sold to the defendant, J. Leon Montgomery by duly recorded deed, thus making the defendants Louis Knaffl and J. Leon Montgomery the joint owners of said three lots. That in the deed from Isabell Knaffl Harlan to J. Leon Montgomery, no restrictions of any kind were placed, but that said Montgomery had actual knowledge that said subdivision was restricted, and that the lots therein were under a general plan of restriction, and that said Montgomery took ownership consequently, of said lots subject to said general restrictive plan. That said defendants Knaffl and Montgomery then entered into an agreement and partnership by which said lots 29, 30 and 35 were to be subdivided into ten smaller lots, each of which was to be sold for residence purposes despite the fact that both defendants well knew that such an action was a violation of the restrictive plan applied in common to all lots in Hillvale. That complainants were not informed and did not know of this plan of the defendants to disrupt the general restrictive plan of Hillvale. That complainants have now discovered that defendants have been interchanging and swapping their respective half interest in the various ten small lots, so that said Knaffl became the owner of lots 1, 6, 8 and 9 and Montgomery the owner of the balance of said ten small lots made from the original lots 29, 30 and 35. That defendant Montgomery has broken dirt and is about to commence the construction of a house on the northeast corner of Lot No. 35, being lot No. 4 as subdivided into small lots by Montgomery and Knaffl, said proposed house being just opposite the home of the complainant, W. W. Carson which house said Montgomery will erect unless restrained

and unless said general plan of restrictions is enforced by this Court. That in purchasing their lots, complainants were shown and relied on the map of Hillvale above referred to, according to which, no lot in Hillvale would have a frontage of less than one hundred feet, whereas, the small lots created by the defendants have an average frontage of considerably less than one hundred feet. That the plan of the defendants to cut up three large lots into ten small lots and erect dwellings thereon, is a violation of the restrictive plan which will result in irreparable damage to complainants, and will lessen the desirability of their residences and lots as home sites, and will serve to destroy the privacy and beauty of the subdivision. That according to the general plan of restriction only one residence was to be erected on each of the original lots. The bill prayed that complainants have a decree enjoining the defendants from proceeding further with their plan to violate the restrictive provisions and general plan of Hillvale and for further relief.

The defendants filed a joint and separate answer on April 6, 1931, in which answer it was admitted that an addition known as Hillvale was formed, platted and put upon the market by the defendant Knaffl, his sister, Mrs. Harlan, and N. E. Logan, and that a map thereof was placed of record in the Register's Office of Knox County But it was denied that the entire subdivision was developed, planned, restricted and sold. It is admitted that said lots in Hillvale were advertised and certain of them sold under restrictions, but it is denied that all of the lots were restricted in the same way by the same language. It is denied also that complainants were influenced and controlled in their decision to purchase lots by reason of said restrictions. It is likewise denied that complainants paid enhanced prices for their lots, or were influenced by representation that said restrictions would apply to all lots in Hillvale. It is admitted that Isabell Knaffl Harlan sold her half interest in said lots 29, 30 and 35 to defendant Montgomery, without restrictions, but it is denied that the alleged general plan of restriction applied to said three lots. It is admitted that the defendants Knaffl and Montgomery proceeded to divide said three lots into ten smaller lots for residential purposes, and that some of the same have been sold and residences erected thereon, but it is denied that defendants knew that their action in re-subdividing violated any restrictive plan, or that the same would violate a restrictive plan. That the complainants were long since put upon notice of the re-subdivision of said three lots, made no objection thereto and are now estopped to complain. It is admitted that defendant Montgomery has broken dirt for the erection of a house and laid the foundation therefor, and has made contracts for material to be used therein, and that said defendant has been caused to suspend

work on account of this suit. It is denied by the defendants that complainants relied in the purchase of their lots on the map of Hillvale, and it is admitted that said ten lots have a less frontage than one hundred feet. It is further denied that the re-subdivision made by the defendants will result in irreparable damage to complainants or that it will lessen the desirability of the residences. It is particularly denied that the proposed house by defendant Montgomery will damage the complainant Carson, or that said erection violates any restrictive plan. That said house proposed by Montgomery is to cost $6000 according to a permit taken out, approved by the City of Knoxville. It is further alleged that there are six houses on said ten lots and that complainants knew when these houses were being constructed and made no objection and are guilty of laches in raising any objection, which laches and estoppel are alleged as a bar to complainants' action. It is then alleged that other lots owned and sold by said N. E. Logan, adjacent to Sequoyah Hills and lying on the back end of the subdivision were sold without any restrictions, and that the restrictions on the lots adjoining Kingston Pike were different from the restrictions on the one hundred foot lots.

The evidence clearly shows that said subdivision was advertised as a high class residential subdivision, that the restrictions were emphasized and that the complainants when they purchased lots and built homes were influenced by said advertisements and were justified in believing that said restrictions would be enforced as to the subdivision. The slight discrepancies in the restrictions in certain deeds are not material and will not be noticed. We think it is clear that Lots 29, 30 and 35 were lots in Hillvale Subdivision and that the original intention of the owners was that they should be used as single lots. They were laid off larger than the lots bought by complainants, but the reason given for this is that the ground was broken, and not suitable for division into 100 foot lots, but adapted to one house with extensive grounds around it. The subdivision into smaller lots, we think, was an after-thought due to the state of the market, making it difficult to sell the large lots.

Leon Montgomery claims that he did not know of the restrictions in the deeds to the lots purchased by complainants. He first testified that he did not know that Lots 29, 30 and 35 were in Hillvale Subdivision, but when his attention is called to the fact that the deed to him of a half interest in said lot describes them as in Hillvale Addition, he admits that this is correct, the record shows this:

"Q. Then you did know at the time you purchased this property that it was lots 29, 30 and 35 in the Hillvale Addition to Knoxville, Tennessee? A. Of course, I did know it was, in this way; of course, I left it to the Title Co., just as I would

if I brought it to you, or Mr. Green, or anybody else, to check up the points of it.

"Q. Then you were mistaken, Mr. Montgomery, when you testified awhile ago that it was not in Hillvale? A. All I had was that the Knaffis told me it wasn't a part of this subdivision called Hillvale.

"Q. I thought you said you didn't say anything about Hillvale? A. That is since this lawsuit has come up.

"Q. But I am talking about back at the time you received your deed, you knew these lots were 29, 30 and 35 of Hillvale? A. The deed called them that way, but I had overlooked about that, because I didn't remember them that way."

The Knaffis did not tell him that these lots did not belong to Hillvale. Besides, after he built a house on one of the lots into which Lot 35 was divided, he advertised the house for rent as a house in Hillvale.

Montgomery says he did not know of any restrictions on lots in Hillvale, but he shows that he was a builder of houses and knew that high class subdivisions were always restricted. Being recalled for further cross-examination he testifies as follows:

"Q. Do you know, Mr. Montgomery, of any such high class subdivision developed since 1920 which has not been restricted. A. No sir.

"Q. The purpose of restricting these subdivisions is to make the property more desirable and hence more salable. Is that correct? A. It is.

"Q. Also to protect the purchaser who buys and builds on the property from the cheapening of the district? A. That's right.

"Q. Do you think these objects would be accomplished if promoters of property could or would modify the restrictions at will? A. Yes, I believe it would be helpful to modify some of them.

"Q. Do you think it would be helpful to cut lots up into smaller lots where restrictions had originally provided for one house to the lot? A. Yes, it could be worked out so that it would be advantageous.

"Q. If that would be true, there would be no necessity of having original restrictions, would there? A. No sir."

It is a little difficult to follow Mr. Montgomery both as to his knowledge of Hillvale and the existence and purpose of restrictions.

It is admitted that Louis Knaffi and his sister agreed to join with Logan who owned adjacent property in forming this subdivision and that while no written agreement was drawn up, they agreed upon

the restrictions as set out herein. It also appears from the testimony of Louis Knaffl that when he and Montgomery agreed to subdivide Lots 29, 30 and 35 they agreed upon substantially the same restrictions applicable to Hillvale and he admits that such restrictions are necessary in order to sell the lots advantageously.

Louis Knaffl testifies as follows:

"Q. Did you make the sale to Mr. Montgomery, did you represent your sister in making the sale to Mr. Montgomery? A. Yes, sir, I did.

"Q. Did you tell him anything about restrictions at that time, mention restrictions at that time? A. No sir, there were no restrictions there at that time, to my mind; that is, as to those lots he bought the half interest in; he bought a half interest.

"Q. Were there any restrictions as to any of those lots in that neighborhood? A. No, sir.

"Q. Did you say anything to him about the matter? A. Of course we went into the subject as to the lots we bought, and we decided there would be as to the lots we sold.

"Q. When you were negotiating the sale of Mr. Montgomery, did you go into the subject with him, the fact that there were no restrictions as to those lots? A. I don't remember; I don't believe I did."

He thinks he had a map of Hillvale Addition when he was negotiating with Montgomery and he says Montgomery knew where the lots were before he bought. Taking the testimony of the two defendants. Montgomery insists that he knew nothing about any restrictions in Hillvale, yet he was a builder and never knew a high class subdivision without restrictions. He is reluctantly forced to admit that he knew the lots in which he bought a half interest were a part of Hillvale. Then he and Knaffl agreed to subdivide their joint holdings into smaller lots and Knaffl says "Of course we went into the subject (that is of restrictions) as to the lots we bought and we decided there would be (restrictions) as to the lots we sold." And yet they try to make out that Montgomery knew nothing about restrictions as to the lots sold to complainants in Hillvale. From the testimony set out, we find that if he did not have actual, he had constructive notice, or at least he knew enough to put him upon inquiry. But it is said the complainants knew about the subdivision of these three lots into ten smaller lots and of the building of houses on some of them and it is now too late to object. We hold that complainants are estopped to object as to all lots except Lot 4 of Lot 30 on the street on which the lots of complainants are located, Hillvale Turn West. As to the other lots, they have been built on, or else by reason of the houses built are so located that the size of them cannot now be changed, but we do not think the estoppel necessarily

applies to Lot 4 upon which Montgomery was about to build, just across the street from complainant Carson and on the same side of the street with other complainants. When one buys a lot in a subdivision with restrictions and builds a home for his family, and has a right to rely on the same restrictions applying to other lots, he cannot be held estopped as to a lot next to him, because he did not object to a violation of the restrictions on another street. It would put too great a burden on the purchaser to hold that because he did not file a bill to enjoin an infringement of restrictions as to a lot on a distant street, though in the same subdivision, that he could not object to the same disregard of conditions as to the lot next to him which affected the enjoyment and value of his home. The other buildings erected on these lots front on other streets almost if not entirely out of view from the homes of complainants. The situation with regard to Lot 4 and the contemplated improvement is very different and while other buildings might have been objected to in proper time, yet the failure to so object cannot be set up as a waiver and estoppel as to the present suit. This distinction is well supported by authority.

A violation of covenants on other streets or another part of the tract does not affect plaintiff's rights. Morrow v. Hasselman, 69 N. J. Eq., 612, 61 Atl. 369; Barton v. Slifer, 72 N. J. Eq., 812, 66 Atl.. 899; Bowen v. Smith, 26 N. J. Eq., 456, 74 Atl., 675. Cited Pom. Eq., Sec. 1702 (Sec. 280).

Not only were these lots 29, 30 and 35 a part of Hillvale Addition, but they were intended at the time of the subdivision to be used as single lots. Mr. Logan having identified the map of Hillvale testifies:

"Q. Mr. Logan, referring to that map to the lots Nos. 29, 30 and 35, I will ask you what was the purpose of making those particular lots larger than the lots nearer the pike there in the Addition? A. The idea was that the lots nearer the pike laid better than these other large lots which were not even and had some gullies and waste land on them.

"Q. Was it not considered that to sell those lots considerable ground would have to be added; that is, they would have to be made large lots? A. That was the reason for making them that size. They would have to be larger than the other lots because of the waste land on them.

"Q. What, if any, understanding or agreement did you have with Mr. Knaffl and his sister with reference to restricting the lots in this Addition? A. We had no written agreement, as I understand, just rather a gentleman's agreement to protect each other by keeping up the class of the property, and therefore restricting the cost of the building and as to character of building and as to the size of the lot.

"Q. And how about the question as to how many houses should be on one lot? A. One house to the lot was understood.

"Q. Did that agreement apply to lots 29, 30 and 35 as well as the other lots? A. Yes.

"Q. What effect, if any, Mr. Logan, does the crowding of houses or say the building of some 10 houses on 3 lots, have on a high class subdivision? A. It has a bad effect and decreases the desirability and value both. It has always been my policy to make lots large."

A fact is brought out in the proof which affords a reason for the change of plan by defendants as to these lots. A road known as Oakhurst Drive to the West of said subdivision was opened up by the City of Knoxville. This road extending along the west side of Lots 29, 30 and 35 made it possible to cut them up into smaller lots facing on said drive. This occurs in Mr. Knaffl's testimony:

"Q. Now, Mr. Knaffl, speaking of the cutting up into lots, I will ask you if Lots 29, 30 and 35 are not by their nature and the lay of the land, being very rough land, lots of such a nature as that you considered in the beginning that you would have to make big lots of them in order to be able to sell them? A. Well, we didn't know; we didn't know, we didn't know that 50-foot street on the other side was going to be opened up; it was later done."

No authority is furnished by counsel for complainants to support the contention that Montgomery holding under a deed without restrictions was bound to respect the restrictions in the deeds of complainants or that Knaffl as to unsold lots was bound by the same restrictions put in the deeds to complainants and there are some cases cited on the other side which might seem to warrant a contrary holding. However, we think they are based upon a different state of facts and circumstances from the present case. The brief for complainants cites 18 Corpus Juris, 394, 397, and Hall v. Ashford, 6 Tenn. Civil App., 171, but these authorities relate to the rights of grantees whose deeds contain restrictions to enforce same against other grantees holding under deeds with similar restrictions. The latest case we find in this State dealing with the subject of restrictions is White v. Refining Co., 156 Tenn., 474, 2 S. W. (2d) 414, and that again is a grantee seeking to enjoin another grantee and the Court says:

"Building restrictions are to be given a fair and reasonable meaning so as to ascertain the intention of the parties and in discovering the intention it is always necessary to consider the situation of the parties and the surrounding circumstances, with a view of ascertaining the meaning intended to be conveyed by the language used"—citing Blair v. Billingsly, Peck, 65; Laughlin v. Wagner, 146 Tenn., 655, 244 S. W., 475.

The idea expressed in this quotation runs through the cases on the subject and it is just as applicable to a case of a grantee with restrictions against the grantor with unsold lots, as against another grantee subject to restrictions.

One of the questions to which the courts attach importance is whether the subdivision is a general plan or scheme for the benefit of all purchasers of lots, let us say for instance, on the same street. Whatever varying facts and circumstances have led the Courts in other cases to decide for or against the idea of a general scheme, we think there can be but one conclusion reached in the present case: The Knaffls and Logan owning adjoining tracts agreed upon a residence subdivision with restrictions. They laid off a U shaped street called West and East Turn. They advertised the subdivision as a residence and restricted subdivision. They sold lots on this street to the complainants who built homes on them. Louis Knaffl, according to Exhibit 4 to his deposition, still owns Lot 28 fronting 100 feet on the west side of Hillvale Turn West. Suppose he should propose to sell this lot without restrictions to one who proposed to use it for a purpose utterly at variance with the purpose and scheme of the subdivision. We think it requires no authority to declare that a court of equity would not hesitate to grant an injunction. No court of conscience would permit an owner of land to lay off a street like this, coax purchasers to buy lots and build homes and then violate the sanctity of those homes by selling a lot he had left, for a business ruinous to a residence street. Lot 35 had a front of 228 feet on this street and the same depth as Lot 28. Let us consider the rule applicable to this lot while still owned by the grantors who sold to complainants. In our opinion the owners would be bound to observe the same restrictions on account of the mutual obligations pertaining to this street. Suppose the subdivision outside of the city and not protected by any zoning ordinance, but only by contractual restrictions and that the owner proposed to sell without restrictions for a fertilizer factory. It is not conceivable that a court of equity would tolerate the idea for a moment. If one restriction applies then all must apply.

Let us now consider the question as to Montgomery. Suppose he had purchased a half interest in Lot 28, as he did in Lot 35. Would the case have been different so far as he was concerned as to Lot 28 from that as to Knaffl and if not, would it be different as to Lot 35? We have already discussed the reasons why Montgomery is affected with knowledge of the conditions and circumstances as to this Hillvale Subdivision. In addition to all other sources of information as to these restrictions and the history of this subdivision, he was associated with Louis Knaffl in the ownership of said lots and as to so

much of said property as fronts on said street, must be held to have the same knowledge and be bound by the same obligations as Knaffl. As to all said lots except Lot 35 whether we consider that complainants did not have the same right to enforce the restrictions or if they did, that they had waived their rights, by failure to object to the action of defendants at the proper time, complainants can have no relief. As to Lot 35 we hold that the right which complainants had has been waived except as to Lot 4 thereof and as to this, complainants are entitled to an injunction restraining defendants from violating the restrictions imposed on the lots of complainants in regard to said Lot 4 and especially as to the building line the permitting only one house to the lot and the character and costs of the house.

The rule is, if lots are embraced in a general building scheme for the benefit of grantor and grantees alike, and for the benefit of all the property involved and the conditions and circumstances have not changed, then the grantor is bound to impose the same restrictions upon all lots. If in such a scheme he sells some lots with restrictions necessary for the purpose of the plan there is a mutual obligation between grantor and grantees to observe said restrictions, and it goes without saying that this applies to unsold lots in the hands of the grantor. Pomeroy's Equity (4 Ed., sec. 1697) (sec. 275a), and notes.

Where the scheme embraces property not then owned by the grantor, but afterwards acquired, the rule applies to this also. Schmidt v. Palisade Supply Co. (N. J. Eq.), 84 Atl., 807.

The Court, quoting from another New Jersey case, says:

"The equity would seem to spring from the presumption that each purchaser has paid an enhanced price for his property, relying on the general plan, by which all the property is to be subjected to the restricted use, being carried out, and that, while he is bound by and observes the covenant, it would be inequitable to him to allow any other owner of land subject to the same restrictions, to violate it."

The reasoning of these cases applies alike to the owner of unsold lots and to the grantees of other lots.

There are cases holding that restrictions cannot be enforced, but they are cases in which there was no such general improvement scheme as in the present case, or cases where the conditions have changed so as to make the restrictions inequitable as where the property restricted for residence purposes has become adapted for business purposes only. Or where the defendant purchaser had no notice and nothing to put him on notice. No case like the present can be found in which it has been held that the restrictions do not bind both grantees and grantor. In this case there was a general scheme to lay off lots in a high class residence subdivision, with restrictions absolutely necessary to protect the property of both grantor and gran-

518

tees. The lots in question are all on one street. The conditions have not changed. It is still a purely residence street, a street of homes and the restrictions necessary to preserve the integrity of the street are almost a matter of life and death to these homes. The conditions and circumstances show the purpose and meaning of these restrictions and that said purpose and meaning would be defeated by allowing the grantor to ignore them as to unsold lots, and not only this, but the situation to one who like Montgomery, knew that all such subdivisions had just such restrictions carried with it knowledge of the restrictions. The situation speaks for itself and in terms that cannot be misunderstood. The complainants acquired equitable easements as to other lots and this right can be enforced against defendants by injunction.

If then, Lot 35 had not been subdivided, it would be subject as a single lot to the restrictions set out. As complainants must be considered estopped as to Lots 1, 2 and 3 of Lot 35 only Lot 4 is left to consider, and as to this, only three restrictions are likely to be violated, that is, that only one house be built on a lot and no house within less than 30 feet of the street and no dwelling house must be erected to cost less than $5000. Nevertheless, all the restrictions apply and should be observed. It results that the assignments of error are sustained, the decree of the lower Court is reversed and as to so much of Lot 35 as remains, that is Lot 4, as appears from the map, defendants will be enjoined from violating any of the restrictions set out in the deeds of complainants. If there is loss to defendant Montgomery, we think defendant Knaffl should share the same, but no case is presented upon which the court could act in this regard. Defendants jointly will pay the costs.

Owen and Senter, JJ., concur.